AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 2:20-MJ-03885 |
| 1344 Paseo Zacate | ) |
| San Dimas, California  91773 | ) |
| | ) |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1029, 1040, 1341, and 1349 | See Attached Affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days:* _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

MARCUS VALLE, Special Agent (DOL-OIG)
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA

HON. MICHAEL R. WILNER, U.S. Magistrate. Judge
*Printed name and title*

AUSA:  Ranee A. Katzenstein (X2432)

## ATTACHMENT A

The **SUBJECT PREMISES** is a residential property located at located at 1344 Paseo Zacate in the city of San Dimas. **SUBJECT PREMISES** faces north. The **SUBJECT PREMISES** is a two-story beige stucco home with a brown tile roof and brick entryway and brick fireplace adjacent to the front door.  The numerals "1344" are affixed to the paneling between the white single and double car garage doors.  The front door is brown with an oval glass window and is located on the east side of **SUBJECT PREMISES**.

The **SUBJECT PREMISES** includes all attached and unattached rooms, attics, garages, vehicles on the driveway and/or parked on the street directly outside the premises, storage areas and units, boxes, safes, lockers, bags, trash bins or bags, trash areas, mailboxes, any other common areas associated with the premises (such as a common mail receiving area), and any containers found in the aforementioned areas.

The **SUBJECT PREMISES** are further described in the photo comprising Exhibit 1, below.

EXHIBIT 1



**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of Title 18, United States Code, Sections 1029 (Fraud and related activity in connection with access devices), 1040 (Fraud in Connection with Emergency Benefits), 1341 (Mail Fraud), and 1349 (Attempt and Conspiracy to commit Mail Fraud) (the "Subject Offenses"):

a.    For the period of January 1, 2020, to the present, records, documents, correspondence, faxes, and e-mails sent to and received from any State Workforce Agency including the California Employment Development Department, including any applications for Unemployment Insurance.

b.    For the period of January 1, 2020, to the present, records and documents containing information, including Personally Identifiable Information, e.g., names, Social Security Numbers, dates of birth, addresses, phone numbers, and driver's license numbers, to be used in support of any application for Unemployment Insurance, and/or any claim of continuing eligibility for Unemployment Insurance.

c.    For the period of January 1, 2020, to the present, checks and EBP cards received from any State Workforce Agency including the California Employment Development Department.

d.    For the period of January 1, 2020, to the present, Vintage Realty and Finance payroll and personnel

records, real estate commissions receipts, IRS Forms W-2, IRS
Forms W-4, IRS Forms 1099, State and Federal Tax Returns.

      e.   Copies of and actual driver licenses, state
identification cards, passports, and other forms of
identification.

      f.   Indicia of occupancy, residency, control, and/or
ownership of the **SUBJECT PREMISES**, including utility bills,
telephone bills, loan payment receipts, rent documents, keys,
photographs, and bank records.

      g.   For the period of January 1, 2020, to the
present, bank records or records received from financial
institutions, including debit cards; correspondence regarding
debit card accounts; wire transfer records; bank statements and
associated transactional records; money drafts; letters of
credit; safety deposit box keys and records; checkbooks; money
wrappers; money containers; income tax records; payroll records;
credit cards; and any other records of financial transactions
that reflect the disposition and/or allocation of monies.

      h.   Cash or cash equivalents such as pre-paid cards
in excess of $500.

      i.   For the period of January 1, 2020, to the
present, records relating to the acquisition, secreting,
transfer, concealment, and/or expenditure of money.

      j.   Any digital device which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the **SUBJECT OFFENSES**, and forensic copies thereof.

k.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

iii

viii.     records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

v

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

vii

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress BONIFACIO JASTILANA MARINAS's and/or MARILYN GOLFO MARINAS's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of BONIFACIO JASTILANA MARINAS's and/or MARILYN GOLFO MARINAS face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or

finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Marcus Valle, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.    I am a Special Agent with the U.S. Department of Labor-Office of Inspector General (DOL-OIG), and have served in this capacity for seven years.  I am presently assigned to the Los Angeles Regional Office of DOL-OIG.  My responsibilities as a DOL-OIG Special Agent include investigating unemployment insurance fraud, mail fraud, identity theft, as well as other related crimes. I am a graduate of the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.  As part of the training provided at FLETC, I successfully completed the Basic Training course, which included, but was not limited to, courses in criminal and constitutional law.

## II. PURPOSE OF AFFIDAVIT

2.    I make this affidavit in support of an application for a warrant to search the single family residence located at 1344 PASEO ZACATE, SAN DIMAS, CALIFORNIA 91773, described in Attachment A (**"SUBJECT PREMISES"**), for evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 1029 (Fraud and related activity in connection with access devices),[1] 1040 (Fraud in Connection with Emergency

---

[1] Among other offenses, 18 U.S.C § 1029 provides that whoever "knowingly and with intent to defraud possesses fifteen or more devices which are counterfeit or unauthorized access devices" shall be guilty of an offense against the United

Benefits),[2] 1341 (Mail Fraud),[3] and 1349 (Attempt and Conspiracy to Commit Mail Fraud)[4] (collectively, the **"SUBJECT OFFENSES"**), as described more fully in Attachment B, which is incorporated here by reference.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all

---

States. 18 U.S.C. § 1029(a)(4).  The statute provides that the term "unauthorized access device" includes any access device that is "obtained with intent to defraud."  18 U.S.C. § 1029(e)(3).

[2] Section 1040 of Title 18 provides that whoever "(1) falsifies, conceals, or covers up any trick, scheme or device any material fact; or (2) makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or representation, in any matter involving any benefit authorized . . . . transmitted, transferred, disbursed, or paid in connection a major disaster declaration under section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5191)" where the payment of the benefit affects interstate commerce or the benefit is at any point transmitted in the mail, shall be guilty of an offense against the United States.

[3] Section 1341 of Title 18 provides that whoever, having devised a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, uses the mail to execute such scheme, shall be guilty of an offense against the United States.

[4] Section 1349 of Title 18 provides that whoever attempts or conspires to commit mail fraud shall be guilty of an offense against the United States.

conversations and statements described in this affidavit are related in substance and in part only.

### III. PREMISES TO BE SEARCHED

4.     The **SUBJECT PREMISES** is a residential property located at 1344 Paseo Zacate in the city of San Dimas.  The **SUBJECT PREMISES** is a two-story beige stucco home with a brown tile roof and brick entryway, facing north, and brick fireplace adjacent to the front door.  The numerals "1344" are affixed to the paneling between the white single and double car garage doors.  The front door is brown with an oval glass window and is located on the east side of the **SUBJECT PREMISES**.  The **SUBJECT PREMISES** are more fully described in Attachment A, which includes a photograph of the **SUBJECT PREMISES** as Exhibit 1.

### IV. STATEMENT OF PROBABLE CAUSE

#### A.     Summary of Probable Cause

5.     The U.S. DOL-OIG, California Employment Development Department ("EDD"), Internal Revenue Service-Criminal Investigation, United States Postal Inspection Service, and United States Secret Service are investigating a fraudulent scheme in which the perpetrators fraudulently apply for and obtain unemployment insurance ("UI") benefits under the Pandemic Unemployment Assistance ("PUA") provision of the federal CARES Act, a provision that is designed to help unemployed individuals obtain UI benefits as part of the nation's response to the economic harms caused by COVID-19.

3

6.   The investigation has obtained evidence that BONIFACIO
JASTILANA MARINAS ("BONIFACIO") and his spouse and business
partner MARILYN GOLFO MARINAS ("MARILYN") have filed and caused
the filing with EDD of fraudulent UI benefit claims that falsely
assert the named claimants are self-employed real estate agents
who were negatively affected by the COVID-19 pandemic,
triggering eligibility for UI benefits under the PUA provision
of the CARES Act.  The UI claims submitted in furtherance of the
scheme falsely report to EDD that the named claimants reside and
work as real estate agents in Los Angeles County, within the
Central District of California.  To the contrary, the
investigation has shown that many of the persons named as the
claimants have no residential history in Los Angeles County or,
indeed, anywhere in the State of California but rather appear to
reside in Saipan[5] or the Philippines, and have no employment
history in Los Angeles County or anywhere in the State of
California and are not registered with California as real estate
agents.  By falsely asserting that the claimants are residents
of California who are eligible for UI benefits, BONIFACIO and
MARILYN and others working with them falsely represent that the
named claimants are entitled to UI benefits administered by EDD
when, in fact, they are not.  The fraudulent UI claims are

---

[5] Saipan is the largest of the Northern Mariana Islands, a
U.S. commonwealth in the Western Pacific. Individuals born in
the Northern Mariana Islands are citizens of the United States.
Residents of the Northern Mariana Islands cannot vote in federal
elections, but they do elect a delegate to the U.S. House of
Representatives, who serves for a term of two years and has
limited voting abilities.

submitted electronically using IP addresses that are registered to the **SUBJECT PREMISES.**

7.   The submission of the UI claims causes mailings to the addresses provided on the claims, including mailings of Electronic Bill Payment ("EBP") debit cards administered by Bank of America ("BofA") that are used to access the fraudulently obtained UI benefits.  The **SUBJECT PREMISES** was used as the mailing address for at least 85 claims submitted as part of the scheme.  BONIFACIO and MARILYN have each identified the **SUBJECT PREMISES** as their residence on their California Driver's Licenses, and law enforcement databases show that the **SUBJECT PREMISES** are held by the MARINAS GOLFO LIVING TRUST.  Two vehicles registered to BONIFACIO have been observed parked in the driveway of the **SUBJECT PREMISES.**  Both BONIFACIO and MARILYN have been observed using some of the EBP debit cards mailed to the **SUBJECT PREMISES** to withdraw the fraudulently obtained UI benefits at Automated Teller Machines (ATMs).

**B.   Unemployment Benefits**

8.   Since 1935, The U.S. Department of Labor's Unemployment Insurance (UI) program has provided unemployment benefits to eligible workers who become unemployed through no fault of their own.  This program ensures that at least a significant portion of the necessities of life -- most notably food, shelter, and clothing -- are met on a weekly basis while the worker seeks employment.  UI beneficiaries who meet the requirements of the applicable state law are eligible for this

5

temporary financial assistance.  Each state administers a separate UI program within the guidelines established by Federal law.  In the state of California, EDD administers the UI program for residents and others physically performing work activities in California.

9.   Generally speaking, regular UI claimants must be: 1) unemployed through no fault of their own; 2) able and available for work; 3) willing to accept suitable work; and 4) actively seeking work.

### C.   Pandemic Unemployment Assistance under the CARES Act

10.  On March 13, 2020, the President of the United States declared COVID-19 an emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act.  As a result, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which the President signed into law on March 27, 2020.  The CARES Act provides over $2 trillion in economic relief protections to the American people from the public health and economic impacts of COVID-19.

11. Prior to the enactment of the CARES Act, to be eligible for UI administered by EDD, a person must have been employed and worked in California and received at least a certain amount of wages from an employer in the 18 months preceding his/her UI benefits claim.  Because of this requirement, self-employed workers, independent contractors, and employees with insufficient earnings were not eligible to receive regular UI benefits.

6

12. The CARES Act established a new program – Pandemic Unemployment Assistance ("PUA") -- to provide unemployment benefits during the COVID-19 pandemic to people who do not qualify for regular unemployment insurance benefits including business owners, self-employed workers, independent contractors, and those with a limited work history who are out of business or have significantly reduced their services as a direct result of the pandemic.  UI benefits provided under the PUA program are sometimes referred to as PUA benefits.

13. Under the PUA provisions of the CARES Act, a person who is a business owner, self-employed worker, independent contractor, or gig worker can qualify for PUA benefits administered by EDD if he/she previously performed such work in California and is unemployed, partially unemployed, unable to work, or unavailable to work due to a COVID-19-related reason.[6] Examples of non-business-owner occupations that may qualify a person for PUA benefits are realtor, barber, hairstylist,

---

[6] COVID-19 related reasons for being out of work include: being diagnosed with COVID-19 or experiencing symptoms of COVID-19 and seeking a medical diagnosis; being unable to work because a health care provider advised self-quarantining due to concerns related to COVID-19; having a household member who has been diagnosed with COVID-19; providing care for a family or household member who has been diagnosed with COVID-19; having primary caregiving responsibility for a child or other household member who is unable to attend school or another facility that is closed as a direct result of the COVID-19 and the school or facility care is required for the claimant to work; becoming the breadwinner or major support for a household because the head of household died due to COVID-19; the claimant has quit his/her job due to COVID-19; the place of employment has closed due to COVID-19; a job that the claimant was scheduled to start is no longer available due to the COVID-19 public health emergency; or the place of employment is inaccessible due to the COVID-19 public health emergency.

freelance photographer, construction handyman/woman, gardener, and ride-share driver.[7]

14.  EDD began accepting applications for PUA benefits on April 28, 2020.  To make benefits available as quickly as possible, payments are issued in phases.  If a claimant qualifies for PUA benefits, the minimum payments are as follows based on the claim's start date:

> Phase 1: For claims with start dates from February 2 to March 28, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.
>
> Phase 2: For claims with start dates from March 29 to July 25, 2020, $167 plus $600 per week for each week the claimant is unemployed due to COVID-19.
>
> Phase 3: For claims with start dates from July 26 to December 26, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.

15.  PUA applicants may be eligible for more than the minimum weekly benefit amount of $167 if their annual income for 2019 reported on the PUA application meets a minimum threshold.

16.  A UI claimant can usually collect 26 weeks of regular state UI benefits.  The CARES Act provides for additional Pandemic Emergency Unemployment Compensation ("PEUC"), which

---

[7] To be eligible, such person must also not be participating in the UI Elective Coverage program.  Under the provisions of the California Unemployment Insurance Code (CUIC), employers may elect Unemployment Insurance (UI) and State Disability Insurance (SDI) or only Disability Insurance (DI) coverage for themselves. Self-employed individuals, who are not employers, may only elect SDI coverage for themselves.

provides up to 13 weeks of additional payments, for a total of 39 weeks of benefits.  PEUC is available to persons who were or are fully or partially unemployed at any time between from March 29 through December 26, 2020.  Persons with a regular UI claim, a PUA claim or a PEUC extension filed between March 29 and July 25, 2020, also receive Federal Pandemic Unemployment Compensation ("FPUC"), which is the extra $600 per week.

17. Persons applying for PUA benefits do not need to submit any supporting documents to the EDD with their applications.  Claimants enter their total income for the 2019 calendar year on the application.  The stated income will be used to pay the minimum benefits of $167 per week.  EDD may request documentation to provide proof of the stated income.[8] If the income information provided by the PUA claimant meets an annual earnings threshold of $17,368 or more, the EDD will work as quickly as possible to verify the claimant's income using other resources available to EDD in order to increase the PUA weekly benefit amount.

18. Like regular UI claims, PUA claims can be filed online.  When an individual files a PUA claim online, EDD automatically maintains certain information regarding the filing of the claim.  This information includes the date and time the claim was submitted, the name of the person for whom the claim was filed, and the IP address of the computer, or ISP account, that was used to file the claim.

---

[8] In general, EDD accepts items such as an annual tax return, 1099 forms, W-2s, and pay stubs as proof of income.

19. A PUA claimant must answer various questions to establish his/her eligibility for PUA benefits.  The claimant must provide his/her name, Social Security Number, and mailing address.  The claimant must also identify a qualifying occupational status and COVID-19 related reason for being out of work.

20. After it accepts a UI claim, including a claim submitted pursuant to the PUA program, EDD typically deposits UI funds every two weeks to an Electronic Bill Payment ("EBP") debit card administered by the Bank of America ("BofA"), which the claimant can use to pay for his/her expenses.  The EBP card is sent via the U.S. Postal Service to the claimant at the address the claimant provides in their UI claim.  Claimants can activate their debit card over the phone or online.

21. When receiving regular UI benefits, a claimant must complete a Continued Claim Form (DE 4581) and certify every two weeks, under penalty of perjury, that he/she remains unemployed and eligible to receive UI benefits.  EDD authorizes and deposits payment to the EBP debit card after it receives the Continued Claim Form.  On or about April 23, 2020, California Secretary of Labor Julie Su directed the EDD to temporarily suspend the requirement for UI claimants to provide unemployment certifications (Continued Claim Forms).[9]  The Continued Claim Form was waived to prevent any unnecessary delays in dispensing benefit payments.

_____

[9] The temporary suspension of the continued claims forms covered the weeks ending March 14, 2020 through May 9, 2020.

22.  At present, weekly PUA benefits typically range from $40 to $450.  In order to receive the maximum weekly benefit of $450, a claimant must have earned $11,674.01 or more in the highest quarter of the claimant's base employment period.

**D.    The Scheme to Fraudulently Obtain UI Benefits**

     **1.    The Suspect Claims**

23.  Based on my training and experience, I know that individuals scheming to fraudulently obtain UI benefits generally follow recognizable patterns, including the following indicia, among others:

    a.    Using the identities of other people to file for fraudulent UI benefits in the ID-theft victims' names and then collect the UI funds.  The fraudulently obtained UI benefits are commonly accessed through ATM withdrawals.

    b.    Using addresses the schemers control as the addresses submitted to EDD for the claims so that EBP debit cards and other EDD correspondence will be mailed to these addresses and thus be accessible to the schemers.

    c.    Submitting multiple UI claims from the same IP address for multiple claimants.  These claims are sometimes submitted on the same day close in time.

    d.    Providing the same phone number for multiple UI claims for different claimants.  The phone number is usually one that the schemers control.

24.  Because PUA claims do not require supporting documentation, including Continuing Claim Forms which were

11

temporarily suspended from March 14, 2020 through May 9, 2020, PUA has become a prime target for fraud.

25.   On or about June 12, 2020, DOL-OIG and the EDD Criminal Investigation Division ("EDD CI Division") identified approximately 73 PUA claims filed with EDD using the **SUBJECT PREMISES** as the mailing address.   To date, a total of 85 PUA claims have been identified as having been filed with EDD using the **SUBJECT PREMISES** as the mailing address.[10]

26.   Through research conducted by the EDD CI Division and my own investigation, I have learned that these 85 PUA claims have other commonalities, as follows:

a.   First, the occupation identified on most of these claims is self-employed real estate agent.

b.   Second, as discussed in paragraph 27, below, at least 73 of the 85 claims were submitted from IP addresses associated with the **SUBJECT PREMISES**, with one filed using IP address 104.175.101.36 and the remaining 72 claims filed using IP address 104.175.71.101.

c.   Third, at least 73 of the 85 claims were all filed between April 8, 2020 and May 20, 2020.

d.   Eighty (80) of the 85 PUA claims provided the same telephone number ending in 8738 as the telephone number of the named claimant.

e.   Forty-four (44) of the 85 PUA claimants share the same last name.

---

[10] Eight of the PUA claimants, also filed regular UI claims, all of which also used the **SUBJECT PREMISES** address.

27. From March 2020 to July 14, 2020, EDD paid out approximately $370,678 in PUA benefits on the 85 claims that use the **SUBJECT PREMISES** as their mailing address.  The total amount of benefits available on these 85 PUA claims, i.e., the potential loss, is approximately $1,013,266.

### 2.   The Suspect Claims are Connected to BONIFACIO, MARILYN and the SUBJECT PREMISES

28. The 85 PUA claims are all connected to BONIFACIO, MARILYN and the **SUBJECT PREMISES** in the following ways:

a.   According to Charter Communications, BONIFACIO was the subscriber for IP addresses 104.175.101.36 and 104.175.71.101, at the time the UI claims were submitted online to EDD.  BONIFACIO's Internet service address is the **SUBJECT PREMISES** and this service remained active as of June 25, 2020.

b.   BONIFACIO's California Department of Motor Vehicles ("DMV") driver's license with an expiration date of March 14, 2023, identifies the **SUBJECT PREMISES** as his residential address.

c.   MARILYN's California DMV driver's license with an expiration date of December 18, 2022, identifies the **SUBJBECT PREMISES** as her residential address.

29. On July 10, 2020, I queried the internet and law enforcement databases and determined that the phone number ending in 8738 that is used on all 85 claims belongs to BONIFACIO's business, Vintage Realty and Finance ("Vintage R&F").

13

30. On July 14, 2020, I learned from a real estate license query submitted to the California Department of Real Estate ("CA DRE") the following:

a.   BONIFACIO is a licensed real estate broker with CA DRE.

b.   BONIFACIO's real estate broker's license is active with an expiration date of April 18, 2022.

c.   BONIFACIO has been licensed through CA DRE as a real estate salesperson since December 9, 2004, and as a real estate broker since April 19, 2006.

d.   BONIFACIO operates his real estate business under the fictitious business name Vintage Realty and Finance, located at 1050 Lakes Dr. Ste. 225 West Covina, CA 91790.

e.   Vintage R&F is a licensed real estate corporation with the CA DRE.

f.   Only six real estate salespersons, including BONIFACIO's spouse, MARILYN, are identified as real estate salespersons working for/with BONIFACIO at Vintage R&F.

31. On July 14, 2020, I reviewed the Articles of Incorporation filed with the California Secretary of State for Vintage R&F.  These Articles of Incorporation identified BONIFACIO as the manager of Vintage R&F.

### 3.   Sample of the Suspect Claims

32. Starting on July 14, 2020, and continuing to the present, I have been reviewing a sampling of 10 of the suspect PUA claims discussed above, which were submitted to EDD between

14

May 1, 2020, and May 16, 2020.  All 10 claims report the **SUBJECT PREMISES** as the claimant's mailing address and all 10 were electronically filed from one of the above-referenced IP addresses located at the **SUBJECT PREMISES.**  All of the claims were filed using almost identical information, as follows:

a.   All 10 of the PUA claimants reported the **SUBJECT PREMISES** as both their mailing and residential address.

b.   All 10 of the PUA claimants reported the phone number of Vintage R&F as their phone number.

c.   All 10 of the PUA claimants reported Vintage R&F as the physical address of their place of business/employment.

d.   All 10 of the PUA claimants reported being unemployed because of a "disaster," namely COVID-19.

e.   All 10 of the PUA claimants selected the following self-attestation:  *"You are an independent contractor with reportable income (ex. IRS Form 1099) and you are forced to stop working because COVID-19 has severely limited your ability to continue performing your customary work activities."*

f.   All 10 of the PUA claimants reported their place of residence and work as Los Angeles County.

g.   All 10 of the PUA claimants provided the exact same explanation (including the same grammatical error) why the disaster prevented them from continuing or beginning self-employment: *"Unable to show and sale* [sic] *properties to prospective buyers/clients due to state ordered quarantine or self-distancing."*

15

h.   All 10 of the PUA claimants reported their "usual occupation" as "real-estate agent."

i.   All 10 of the PUA claimants reported being associated with a "union," namely the California Association of Realtors.

j.   All but two of the PUA claimants reported having no driver's license.[11]

33.   Between July 14, 2020, and the present, I attempted to identify and locate the 10 PUA claimants and discovered that -- notwithstanding the statements on their PUA applications that they resided and worked in Los Angeles County -- all 10 PUA claimants appear to be residing in Saipan or the Philippines. Further, notwithstanding the statements on their PUA applications that their occupation was "real-estate agent," none of the 10 PUA claimants appears to be licensed by the CA DRE.

PUA CLAIMANT F.U.

34.   I consulted law enforcement databases regarding the information provided for F.U. on the PUA claim filed in F.U.'s name, and learned the following:

a.   The databases show that the SSN provided for F.U. was issued in the Pacific Territories.[12]

---

[11] The driver's license numbers reported by the two PUA claimants who reported having driver's licenses numbers were in fact issued to other California residents who have no known connection to the scheme.

[12] The U.S. has five permanently inhabited territories: Puerto Rico and the U.S. Virgin Islands in the Caribbean Sea, Guam and the Northern Mariana Islands in the North Pacific Ocean, and American Samoa in the South Pacific Ocean.

16

b.    The databases do not reflect any current residential address for F.U. in California or the United States other than a business address formerly associated with BONIFACIO.

35.  On July 17, 2020, I queried a database of information pertaining to international border crossings regarding F.U. and found no instances of travel by F.U. between the Pacific Territories and the U.S. mainland in the last five years.

36.  I reviewed public postings on Facebook and found an individual whose name exactly matched F.U.'s name, including its unique spelling.  This individual states that he is from Saipan and resides in Bolinao, Pangasinan.[13]

37.  On July 17, 2020, I queried a law enforcement database and found no record of a driver's license or identification card issued to F.U. by the California Department of Motor Vehicles ("CA DMV").

38. On July 23, 2020, I conducted a real estate agent/license query on the CA DRE and California Association of Realtors websites and found no licensed realtor by the name F.U.

<u>PUA Claimant G.U.</u>

39.  I consulted law enforcement databases regarding the information provided for G.U. on the PUA claim filed in G.U.'s name, and learned that the SSN provided for G.U., ending in

_____

[13] Bolinao is a town on the west coast of Luzon Island, in the northern province of Pangasinan, Philippines.

17

9071, was issued in the Pacific Territories.  The SSN was assigned to someone by the name R.R., not G.U.

40. On July 23, 2020, I conducted a real estate agent/ license query on the CA DRE and California Association of Realtors websites and found no licensed realtor by the name G.U.

PUA CLAIMANT W.T.

41. I consulted law enforcement databases regarding the information provided for W.T. on the PUA claim filed in W.T.'s name, and learned the following:

a.   The SSN provided for W.T. on the PUA claim, ending in 8965, was issued in the Pacific Territories.  The SSN is assigned to J.R.T.,[14] not W.T.

b.   Law enforcement databases do not reflect any current residential address for W.T. in California.

42. I reviewed public postings on Facebook and found an individual with a Facebook profile[15] using the name W.T. and the exact spelling of W.T's name that appears on the PUA claim. W.T. reports that s/he resides in Saipan.

43. On July 23, 2020, I conducted a real estate agent/ license query on the CA DRE and California Association of Realtors websites and found no licensed realtor by the name W.T.

---

[14] J.R.T., is also a PUA claimant and has a reported mailing address of PO BOX 502021, Saipan, MP 96950.

[15] The Facebook profile for W.T. is a shared profile with a female individual by the name of Teresita Fernandez.

## PUA CLAIMANT J.R.T.

44.  I consulted law enforcement databases regarding the information provided for J.R.T. on the PUA claim filed in J.R.T.'s name, and learned the following:

> a.    The SSN provided for. J.R.T. on the PUA claim, ending in 3797, was invalid.

> b.    The SSN ending in 8965 was assigned to J.R.T. and was issued in the Pacific Territories.  The mailing address associated with J.R.T. is PO BOX 502021, Saipan, MP[16] 96950.

45.  Law enforcement databases do not reflect any current residential address for J.R.T. in California.

46.  On July 23, 2020, I conducted a real estate agent/license query on the CA DRE and California Association of Realtors websites and found no licensed realtor by the name J.R.T.

## PUA CLAIMANT F.V.

47.  I consulted law enforcement databases regarding the information provided for F.V. on the PUA claim filed in F.V.'s name, and learned that the SSN provided for F.V. was issued in the Pacific Territories.  The mailing addresses associated with F.V. include various P.O. Boxes located in Saipan, including PO BOX 505646, Saipan, MP 96950.

48.  Law enforcement databases do not reflect any current residential address for F.V. in California.

---

[16] MP is the postal code for Northern Mariana Islands.

49. On July 17, 2020, a law enforcement database query found no record of a driver's license or identification card issued to F.V. by the CA DMV.

50. On July 17, 2020, I queried a database of information pertaining to international border crossings regarding F.V. and found no instances of travel by F.V. between the Pacific Territories and the U.S. mainland in the last five years.

51. On July 23, 2020, I conducted a real estate agent/ license query on the CA DRE and California Association of Realtors websites and found no licensed realtor by the name F.V.

PUA CLAIMANT B.V.

52. I consulted law enforcement databases regarding the information provided for B.V. on the PUA claim filed in B.V.'s name, and learned that the SSN provided for B.V. was issued in the Pacific Territories.  The mailing address associated with B.V. is PO BOX 505646, Saipan, MP 96950.[17]

53. Law enforcement databases do not reflect any current residential address for B.V. in California.

54. On July 23, 2020, I conducted a real estate agent/ license query on the CA DRE and California Association of Realtors websites and found no licensed realtor by the name of B.V.

PUA CLAIMANT E.T.

55. I consulted law enforcement databases regarding the information provided for E.T. on the PUA claim filed in E.T.'s

_____

[17] PO BOX 505646, Saipan, MP 96950 appears to be associated with PUA Claimants F.V., B.V., and E.T.

name, and learned that the SSN provided for E.T. was issued in the Pacific Territories.  The mailing addresses associated with E.T. include various P.O. Boxes located in Saipan, including PO BOX 505646, Saipan, MP 96950.

56.  Law enforcement databases do not reflect any current residential address for E.T. in California.

57.  On July 17, 2020, I queried a database of information pertaining to international border crossings regarding E.T. and found no instances of travel by E.T. between the Pacific Territories and the U.S. mainland in the last five years.

58.  On July 17, 2020, a law enforcement database query found no record of a driver's license or identification card issued to E.T. by the CA DMV.

59.  I reviewed public postings on Facebook and found an individual with a Facebook profile using the name E.T. and the exact spelling of E.T's name that appears on the PUA claim.  The Facebook profile reports that the person lives in Saipan.

60.  On July 23, 2020, I conducted a real estate agent/ license query on the CA DRE and California Association of Realtors websites and found no licensed realtor by the name E.T.

### PUA Claimant E.M.

61.  I consulted law enforcement databases regarding the information provided for E.M. on the PUA claim filed in E.M.'s name, and learned that the SSN provided for E.M. was issued in the Pacific Territories.[18]

---

[18] E.M. shares the same middle and last name with BONIFACIO.

62. Law enforcement databases do not reflect any current residential address for E.M. in California with the exception of the **SUBJECT PREMISES** and a business address previously affiliated with Vintage R&F.

63. On July 31, 2020, a law enforcement database query found no record of a driver's license or identification card issued to E.M. by the CA DMV.

64. I reviewed public postings on Facebook and found an individual with a Facebook profile using the name E.M. and the exact spelling of E.M.'s name that appears on the PUA claim. The Facebook profile reports that the person lives in Cabuyao Laguna, a city in the Philippines. E.M.'s profile reports that E.M. is married to M.R., in whose name there is also another active PUA claim associated with the **SUBJECT PREMISES**. Based on my review of a Facebook profile in BONIFACIO's name, I believe BONIFACIO is "friends" with the E.M. whose profile is on Facebook.

65. On July 30, 2020, I conducted a real estate agent/ license query on the CA DRE and California Association of Realtors websites and found no licensed realtor by the name E.M.

66. On July 30, 2020, I reviewed Western Union records and learned that two money transfers were made to E.M. in Cabuyao, Philippines, between March 18, 2020 and April 20, 2020, from a sender identified as BONIFACIO with the second transfer being in the amount of $105 on April 20, 2020, and being sent from the 104.175.71.101 IP address, which belongs to BONIFACIO (see paragraph 28(a), above).

PUA Claimant M.M.

67. I consulted law enforcement databases regarding the information provided for M.M. on the PUA claim filed in M.M.'s name, and learned that the SSN provided for M.M. was issued in the Pacific Territories.

68. Law enforcement databases do not reflect any current residential address for M.M. in California.  The mailing address associated with M.M. is PO BOX 505219, Saipan, MP 96950.

69. On July 31, 2020, a law enforcement database query found no record of a driver's license or identification card issued to M.M. by the CA DMV.

70. On July 30, 2020, I conducted a real estate agent/ license query on the CA DRE and California Association of Realtors websites and found no licensed realtor by the name M.M.

71. On July 30, 2020, I reviewed Western Union records and learned that a $600 money transfer was made to "M.Magat" in Saipan on July 7, 2020, from a sender identified as BONIFACIO using the 104.175.71.101 IP address.[19]

PUA Claimant R.T.

72. I consulted law enforcement databases regarding the information provided for R.T. on the PUA claim filed in R.T.'s name, and learned that the SSN provided for R.T. was issued in the Pacific Territories.

---

[19] M.M. has the same last name as BONIFACIO. Law enforcement databases also associate the SSN used for M.M. with "MAGAT."

23

73. Law enforcement databases do not reflect any current residential address for R.T. in California.  The mailing address associated with R.T. is PO BOX 500331, Saipan, MP 96950.

74. On July 31, 2020, a law enforcement database query found no record of a driver's license or identification card issued to R.T. by the CA DMV.

75. I reviewed public postings on Facebook and found an individual with a Facebook profile using the name R.T. and the exact spelling of R.T.'s name that is used on the PUA claim. The Facebook profile reports that R.T. lives in Manila, Philippines.  R.T.'s profile reflects prior employment at "Agua Resort Club, Saipan."  R.T. is "friends" with BONIFACIO, BONIFACIO's child, and E.M. on Facebook.

76. On July 30, 2020, I conducted a real estate agent/ license query on the CA DRE and California Association of Realtors website and found no licensed realtor by the name R.T.

77. On July 30, 2020, I reviewed Western Union records that revealed nine money transfers were sent to R.T. in Saipan between April 17, 2019 and June 11, 2020, by a person identified as BONIFACIO with the most recent transfer being in the amount of $2,000 on June 11, 2020, and being sent from the 104.175.71.101 IP address.  One of the other nine transfers was sent from the 104.175.101.36 IP address, which also belongs to BONIFACIO (see paragraph 28(a), above).  Two of the remaining seven transfers were initiated from unidentified IP addresses; Western Union did not provide IP addresses associated with the other five transfers.

78. On August 12, 2020, Edward Cabrera, who is an investigator with the Office of the Public Auditor, Commonwealth of the Northern Mariana Islands, informed me that R.T. had submitted an application for PUA benefits to the Department of Labor in the Commonwealth of the Northern Mariana Islands.

### 4.   BofA EBP Debit Cards

79. To date, in response to the suspect claims, BofA has mailed approximately 85 EBP debit cards to the **SUBJECT PREMISES** including EBP debit cards in the names of F.U., G.U., W.T., J.R.T, F.V., B.V., and E.T.

80. Between July 21, 2020, and the present, I have been reviewing the BofA transaction history statements associated with the EBP debit cards in the names of PUA claimants F.U., G.U., W.T., J.R.T, F.V., B.V., and E.T.  These records show that the address provided to BofA for these EBP debit card accounts is the **SUBJECT PREMISES**.  In addition to using the same mailing address, these records also show another commonality, namely six of the seven claimants use the same answer - "Lakers" – for the BofA security question for their account.

81. All cash withdrawals and point of sale purchases reflected on the transaction history statements for all seven of the EBP debit cards in the names of PUA claimants F.U., G.U., W.T., J.R.T, F.V., B.V., and E.T., were conducted in cities within Los Angeles County, generally within a 15-mile radius of the **SUBJECT PREMISES**.

25

### 5.   **BofA ATM Surveillance Photos**

82.  Between July 21, 2020 and the present, I have been reviewing ATM surveillance photos documenting cash withdrawals conducted from May 25, 2020 to July 2, 2020, using the EBP debit cards issued for PUA claims submitted in the names of F.U., G.U., W.T, J.R.T, F.V., B.V., and E.T.  The review of the ATM surveillance photos revealed the following:

a.    ATM surveillance footage shows a man fitting the physical description[20] of BONIFACIO using EBP debit cards in the name of J.R.T., F.U., B.V., or F.V. on eight separate occasions. On one occasion, the man withdrew money using the EBT debit cards of both B.V. and G.U.

b.    ATM surveillance footage shows a woman fitting the physical description[21] of MARILYN using EBP debit cards in the names of E.T., W.T., and/or G.U. on each of six separate occasions.  On one occasion, the woman withdrew money using the EBT debit cards of all three of these named claimants.

c.    All of ATM transactions described in subparagraphs a and b, above, occurred within Los Angeles County in the cities of San Dimas, Rowland Heights, West Covina, and Claremont.

---

[20] My knowledge of BONIFACIO's physical characteristics is based on my review of photos of BONIFACIO obtained from CA DMV and viewed on Facebook and other public websites.

[21] My knowledge of MARILYN's physical characteristics is based on my review of photos of MARILYN obtained from CA DMV and viewed on Facebook and other public websites.

d.    On at least two separate occasions, a white BMW sports utility vehicle ("SUV") can be seen on the surveillance footage parked in the distance.  Based on my review of CA DMV records, I know that a 2016 BMW, bearing CA license number 7STB256, is registered to BONIFACIO at the **SUBJECT PREMISES**.

### E.    Summary of Probable Cause that Evidence, Fruits, and Instrumentalities of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES

83. As set forth in more detail in paragraphs 26(b) and 28(a) above, the fraudulent PUA claims underlying the **SUBJECT OFFENSES** were submitted to EDD from IP addresses registered to BONIFACIO using the **SUBJECT PREMISES** as his address.

84. As set forth in more detail in paragraphs 25 and 79 above, the mailing address used on the fraudulent PUA claims underlying the SUBJECT OFFENSES is the **SUBJECT PREMISES**. Because it is the mailing address, EDD sends communications regarding the PUA claims to the **SUBJECT PREMISES**.

85. As set forth in more detail in paragraph 80 above, the mailing address provided to BofA for the EBP debit cards used to access the UI benefits underlying the **SUBJECT OFFENSES** is the **SUBJECT PREMISES**.  Because it is the mailing address, BofA sends communications regarding these cards and associated accounts to the **SUBJECT PREMISES**.

86. As set forth in more detail in paragraphs 26, 29, and 30 above, the business connected to the phone number on the PUA claims underlying the **SUBJECT OFFENSES** is Vintage R&F, which is owned by BONIFACIO, who resides at the **SUBJECT PREMISES**.

27

87. As set forth in more detail in paragraphs 81 and 82 above, the EBP debit cards associated with the PUA claims underlying the **SUBJECT OFFENSES** are being used by BONIFACIO and MARILYN, who reside at the **SUBJECT PREMISES**.

## V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[22]

88. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[22] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

89. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

90. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye,

and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

          b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

          c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BONIFACIO's and/or MARILYN's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of BONIFACIO's and/or MARILYN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

     91. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. <u>ITEMS TO BE SEIZED</u>

92.  Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 1029, 1040, 1341, and 1349 will be found at the **SUBJECT PREMISES**.

## VII. <u>CONCLUSION</u>

93.  For all the reasons described above, there is probable cause to believe that:

a.  BONIFACIO and MARILYN have committed violations of Title 18, United States Code, Sections 1029 (Fraud and related activity in connection with access devices), 1040 (Fraud in Connection with Emergency Benefits), 1341 (Mail Fraud), and 1349 (Attempt and Conspiracy to commit Mail Fraud); and

b.  Evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 1029 (Fraud and related activity in connection with access devices), 1040 (Fraud in Connection with Emergency Benefits), 1341 (Mail Fraud), and 1349 (Attempt and Conspiracy to commit Mail Fraud) as described in Attachment B of this affidavit, will be found in a search of the **SUBJECT PREMISES**, as further described above and in Attachment A of this affidavit.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
August, 2020.


_____
HONORABLE MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE